Denton County District Clerk
By: Velia Duong, Deputy

23-11700-467

## CAUSE NO. _____

| | | |
|---|---|---|
| **ENTERTAINMENT AFFILIATES, L.L.C.,** | § § § § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | § § § | |
| **v.** | § § | **\_\_\_\_ DISTRICT COURT** |
| **ACTIVE8 SOFTWARE LLC, and ROLLER NETWORKS PTY LTD,** | § § § § | |
| *Defendants.* | § § | **DENTON COUNTY, TEXAS** |

## PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, AND TEMPORARY AND PERMANENT INJUNCTION AND MOTION FOR EXPEDITED DISCOVERY

Plaintiff Entertainment Affiliates, L.L.C. ("EA" or "Plaintiffs") hereby brings this Original Petition and Application for Temporary Restraining Order and Temporary and Permanent Injunction against Defendants Active8 Software LLC ("Active8") and Roller Networks Pty Ltd ("Roller") and respectfully shows the Court as follows:

### I.
### RULE 47 STATEMENT AND DISCOVERY LEVEL

1.     The damages sought by Plaintiff are within the jurisdiction limits of this Court. Plaintiff seeks non-monetary relief, and monetary relief greater than $250,000 and less than $1,000,000. This case is intended to be conducted under Discovery Level 2 pursuant to Texas Rule of Civil Procedure 190.3.

### II.
### JURISDICTION AND VENUE

2.     Jurisdiction is proper in this Court because the amount in controversy exceeds the Court's minimum Jurisdictional requirements.

3.      Venue is proper in Denton County, Texas pursuant to the Texas Civil Practice and Remedies Code because the Parties contractually agreed that Denton County is the proper venue for any controversy, claim, dispute or questions arising out of the agreement.

## III.
## PARTIES

4.      Plaintiff Entertainment Affiliates, L.L.C. is a New Jersey limited liability company with a principal office located at 420 Boulevard, Suite 201, Mountain Lakes, New Jersey 07046-1733.

5.      Defendant Active8 Software LLC is a Texas limited liability company with a principal office located at 301 Leora Lane, Suite 250, Lewisville, Texas 75056.  Active8 may be served through its legal counsel, Alexia Nicoloulias, at Burke Bogdanowicz, 1201 Elm Street, Suite 4000, Dallas, Texas 75270 or wherever she may be found. **Issuance of Citation is Requested.**

6.      Defendant Roller Networks Pty Ltd is a foreign entity that is not registered to do business in the State of Texas. Roller may be served through its legal counsel, Alexia Nicoloulias, at Burke Bogdanowicz, 1201 Elm Street, Suite 4000, Dallas, Texas 75270 or wherever she may be found. **Issuance of Citation is Requested.**

## IV.
## VERIFICATION AND EVIDENCE FOR INJUNCTIVE RELIEF

7.      In support of its Application for Temporary Restraining Order, and Temporary and Permanent Injunction, Plaintiff attaches the following evidence that supports the allegations set forth this application for injunctive relief and incorporates them herein by reference:

a.  **Exhibit A**: Declaration of Robert Pagano (the "Pagano Declaration"), with true and correct copies of the following attachments thereto:

     i.   Active8 Software Agreement between Entertainment Affiliates, L.L.C. and Active8 Software LLC attached as **Exhibit A-1**;

    ii.   Active8 Terms and Conditions accompanying the Active8 Software Agreement attached as **Exhibit A-2**;

   iii.   Addendum to the Terms and Conditions between Entertainment Affiliates, L.L.C. and Active8 Software LLC, attached as **Exhibit A-3**;

   iv.   Email correspondence from Active8 announcing retirement of its Software Program, attached as **Exhibit A-4**; and

    v.   Termination Letter from Active8's counsel to EA's counsel, dated December 3, 2023, attached as **Exhibit A-5**.

**V.**
**FACTUAL BACKGROUND**

**The Software**

8.      EA is an affiliate of Rock N Air Adventure Park ("Rock N Air") in East Brunswick, New Jersey. Ex. A, para. 2. Rock N Air is an indoor adventure park for customers of all skill levels, with indoor attractions such as rock climbing walls, trampolines, laser tag, and other attractions. *Id*.

9.      Rock N Air guests buy a pass to access the park's various amenities. Ex. A, para. 3. These guests can either purchase these passes online in advance, or at the time of their arrival to the park. *Id*. Rock N Air is also a popular destination for group events such as birthday parties for children. *Id*.

10.      Every client that accesses the park's attractions is required to sign a waiver of liability before being admitted into the park. Ex. A, para. 4. This waiver is also often signed online prior to the client's arrival to the park. *Id*.

11.      To streamline the client onboarding process, EA contracted with Defendant Active8. The Parties entered into the Active8 Software Agreement (the "Software Agreement"), wherein Active8 provided software services to EA. This software provided a web-based application that provided Point of Sale services, Birthday Party Booking, Birthday Party

Management Online Ticket Purchase, Electronic Waivers, Customer Account Management, Employee Scheduling, and Employee Time Clock (the "Software"). Terms & Conditions, Ex. A-2.

12.    Essentially, the Software is the lifeblood of Rock N Air's daily operations. Ex. A, para. 6. The Software serves as a critical component to the success of the business. The Software enables Rock N Air's clients to register, pay, and sign the waiver online. *Id.* The Software then stores this data and information and provides to Plaintiff's employees easily for reference when the clients check-in. *Id.* The employee can immediately determine if the necessary waiver has been signed by the client.

13.    The Software also tracks a client's history at Rock N Air. *Id.* For instance, if a client has been suspended from Rock N Air for violating the terms of participating, the Software notifies the employee of the client's status and prevents them from entering.

14.    The Software further coordinates all logistics of events scheduled at Rock N Air. Ex. A, para. 7. Rock N Air is a popular birthday destination for children, and the Software is used to schedule and store information for the birthday parties to ensure the intake process proceeds smoothly when the guests arrive, including making sure that guests of the birthday party are joined to the proper party and all guests have signed waivers. *Id.*

**The Software Agreement**

15.    The Software Agreement was entered into between Active8 and EA on April 7, 2021, and provided for an initial term of five (5) years. Ex. A-1.

16.    After entering the Software Agreement, EA spent thousands of dollars purchasing equipment compatible with the Software, including 12 point-of-sale ("POS") Units and 7 waiver stations throughout Rock N Air's facilities. Ex. A, para. 8. EA also spent multiple days training its

employees on how to use the Software and integrate it into its facilities. *Id*. Each new cashier hired to work at Rock N Air is trained on the Software before they begin work. *Id*. Rock N Air currently has a staff of 147 employees, with 54 of them trained and equipped to work with the Active8 Software. Ex. A, para. 9.

17.     The Software Agreement was accompanied by the Active8 Terms and Conditions (the "T&Cs"), which were incorporated into the Software Agreement. The T&Cs contained the majority of the terms governing the relationship between the Parties.

18.     Pertinent to this action, the T&Cs contain a provision regarding "Service Modifications," which states as follows:

> Active8 reserves the right at any time and from time to time to modify the Service (or any part thereof) with or without notice and without altering the material functionality of the Service. Such modifications would be made to correct errors, improve performance, etc. In the event Active8 reasonably believes that any such modification could adversely affect all then-current licensees of the Service then Active8 will inform Licensee of such planned modification in advance and make such modification in a manner to minimize any such adverse effect. Should Acitve8 choose to permanently discontinue the Service, Active8 (i) will exercise its right to terminate the Agreement for convenience pursuant to Section 12.2.3 below, and (ii) will post notification of such decision on the Service web site thirty (30) days prior to such discontinuance. Active8 will not be liable to Licensee or to any User or third party for any modification, suspension or discontinuance of the Service, or for any resulting loss or destruction of any Licensee Content that Licensee placed on the Service after the date of such notice. Active8 may specify in writing from time to time the version(s) of related products required in order to use the Service (e.g., supported browser versions etc.).

Ex. A-2, T&Cs, Section 10

19.     Furthermore, pertinent to this action, the Termination for Convenience Section of the T&Cs states as follows:

> Either party may terminate the Agreement for any or no reason, at the end of the then current term, by sending written notice ninety (90) days, prior to the end of the then-current term, to the other party subject to Section 12.5 and Licensee's fulfillment of its payment obligations through the end of the then-current Term.

Ex. A-2, T&Cs, Section 12.2.3

20.     Active8 and EA both complied with the terms of the Software Agreement, the T&Cs, and the Addendum to the T&Cs from April 2021 through 2023 without issue.

**Active8's Merger and Software Retirement**

21.     On June 20, 2022, EA received an email from Active8's CEO announcing that it has joined forces with Roller, an all-in-one management software company. *See*, Ex. A-4. Apparently, Roller acquired Active8. According to this June 20, 2022 announcement, the Active8 employees were not leaving, but instead operating under the Roller brand. The announcement further stated that the Active8 Software would eventually be retired. Ex. A-4. This announcement came only a year after Active8 and EA entered into the Software Agreement, with four (4) years remaining on the initial term of the Software Agreement.

22.     After subsequent communications between EA and Active8, Active8 confirmed that it would no longer provide the Software to its customers and was forcing its clients all to find a different software option. Ex. A, para. 12. The only available service Active8 would provide is Roller's software platform.

23.     Roller's software is inferior to Active8's Software. EA had the opportunity to utilize Roller's services prior to entering into the Software Agreement, but opted not to do so because of several issues with Roller's operating platform. Ex. A, para. 12.

24.     Instead, less than two years after investing significant capital to integrate the Active8 Software into its business operations, EA was being forced to abandon its practices and procedures, acquire all new equipment compatible with the Roller platform, and re-train all its employees to relearn a new system.

25. This was not the system EA bargained for when entering the Software Agreement. The Roller platform is different and inferior to the Active8 Software in multiple aspects, namely:

  a. Active8 provides an electronic invitation link to a party organizer when a party is booked. The party organizer sends the link to their guests. It directs a guest to complete a waiver and a ticket from the party is assigned to the guest. Roller does not offer this feature.

  b. Active8 has a very easy party check-in process. All the parties are listed on the screen in a row based upon the time and the birthday child's name. If you click on a party a screen appears with the assigned tickets. Roller instead requires you to search for a party, which is sorted with all other guest tickets, and not segregated by party. Rock N Air often has over 100 people checking in at the same time, and the Roller platform creates a logjam on this intake process.

  c. With Active8 a party organizer has approved their guests that have assigned tickets in advance. The tickets have been assigned and they can view this in their account. Roller does not provide the same guest verification processes that Active8's Software offers.

  d. Active8 has a calendar format by day showing all the party rooms. It shows our 7 party rooms as they are located side-by-side. It also shows available times for each room and if a party has been booked. Roller has no calendar or easy way to view the parties.

  e. Active8 permits you to ban people from the park. People are banned for the betterment of the park and other guests. Roller has a feature that flags a guest, but they can still be check-in by a cashier.

  f. Roller has issues with tickets, accounts and linking them to waivers for open play, EA could not overcome these issues for intake purposes. Ex. A, para. 13.

26. After learning of Roller's acquisition of Active8, EA engaged in significant discussions with Active8 to explore any and all possibilities to continue using the Active8 Software, and avoid the issues cited above. Ex. A, para. 12.

27. EA even offered to purchase the Software from Active8 for its own personal use, agreeing not to sell or license the Software to any other parties. While Active8 engaged in these discussions for over a year, ultimately it refused to provide the Software services to EA past the end of 2023. Ex. A, para. 14.

28. Active8 confirmed it was forcing the Roller platform onto EA, claiming this transition to the new platform was a "modification" pursuant to Section 10 of the T&Cs, and

informed EA it would be required to implement brand new hardware and infrastructure, at EA's cost, and eventually sign a new agreement with Roller for its platform. Ex. A-5.

**Acitve8's Termination Notice**

29.     When the conversations between Active8 and EA failed to result in a resolution to EA's issues with the Software, Active8's engaged counsel sent a "Notice of Termination" on December 3, 2023 (the "Termination Notice"). Ex. A-5.

30.     The Termination Notice claimed it was formal notice that Active8 was terminating the Software Agreement for cause, claiming that EA's failure to "accept and comply with the transition of the Service onto the new platform" violated the Software Agreement. Ex. A-5.

31.     Active8 appears to take the position that the "retirement" of the Software and the transition to an entirely new platform is a "modification" pursuant to Section 10, and that EA has no choice but to acquiesce. In reality, this is nothing more than an attempt avoid its contractual obligations to provide EA with the Software through the duration of this initial term.

32.     Modifications are described in the T&Cs as efforts to correct errors and improve performance without altering the material functionality of the Service. *See*, T&Cs, Sec. 10. By terminating the Active8 Software and forcing its clients to use the Roller platform, it is not simply improving the performance of the existing Active8 Software, but is instead replacing it with an entirely new service, even acknowledging that an entire new agreement must be entered in order to use the new platform.

33.     Upon information and belief, Active8 is taking this position to avoid its duties under the Software Agreement and the T&Cs. In reality, Active8 is permanently discontinuing its Software. The T&Cs provide specific language, explicitly stating Active8's obligations under this scenario. If Acitve8 permanently discontinues ("retires") the Software, it must exercise its right to

terminate the Software Agreement for convenience, which requires it to continue providing the Software through the end of the then current term. Ex. A-2, Sec. 10. In this instance, the current term does not expire until April 6, 2026. Ex. A-1.

34.     Seemingly uninterested in adhering to its obligations under the T&Cs, Active8 is fabricating a breach of the Software Agreement by EA in order to avoid continuing to provide the Software to EA as required.

35.     Should Active8 follow through with its intent to revoke EA's access to the Software on January 2, 2024, the results would be disastrous.

36.     Currently, Rock N Air has over 170 parties and events booked through 2024 on the Active8 Software. Ex. A, para. 16. EA could not feasibly transition these events to a new platform and ensure all data was transitioned properly. If EA cannot provide its services to these clients because of this failure, the damages would be incalculable, particularly given the loss of goodwill Rock N Air would face throughout the community. Ex. A, paras. 17-18. Ultimately, Rock N Air's clients would face additional irreparable damages should their previously scheduled birthday parties not be able to proceed as planned with Rock N Air. For many of these parties, it is too late to find a suitable alternative. Ex. A, para. 18.

37.     Furthermore, EA would be forced to close Rock N Air for an extended period of time until it could acquire a brand new software platform, purchase the necessary equipment to manage the software, and train its employees on how to use the new platform. It is unlikely that Rock N Air would have a business to return to once this process was completed. During this time, Rock N Air would not be able to keep its workers employed and paid while the park was closed to implement these new systems, causing greater injury. Ex. A, para. 19.

38.     Based on these catastrophic consequences to EA's business operations and the community it serves, EA brings this action, seeking injunctive relief from this Court to maintain status quo, and require Active8 to adhere to the terms of its Software Agreement until the Parties rights in relation to the Software Agreement can be properly adjudicated.

## VI.
## CAUSES OF ACTION

### Count 1: Breach of Contract

39.     Plaintiff incorporates the paragraphs hereinabove and hereinafter as if set forth verbatim herein.

40.     Plaintiff entered into a valid contract with Active8 by way of the Software Agreement and the incorporated T&Cs.

41.     Active8 breached the Software Agreement by sending the Termination Notice, thereby terminating the Software Agreement without proper grounds. If Active8 proceeds with its threat to revoke Plaintiff's access to the Software, it will be in further breach of the Software Agreement, as it is required to continue providing these services throughout the current term.

42.     As a direct and proximate result of Active8's breach, Plaintiff has been damaged and will continue to suffer damages. Plaintiff is not able to calculate the damages it will incur if Active8 indeed revokes Plaintiff's access and use of the Software. Plaintiff now seeks judgment against Defendants for injunctive relief, and any actual damages, pre-judgment and post-judgment interest, costs of court, and attorney's fees it may incur.

### Count 2: Declaratory Judgment

43.     Plaintiff incorporates the paragraphs hereinabove and hereinafter as if set forth verbatim herein.

44.     There exists a genuine controversy between Plaintiffs and Defendants regarding the terms of the Software Agreement.

45.     Plaintiff contends that Active8's actions, including being acquired by Roller, "retiring" its Software, and forcing all its clients under contract to transition to Roller's platform constitutes a permanent discontinuance of the Service, as referenced in Section 10 of the T&Cs. As such, Active8 must terminate for convenience pursuant to Section 12.2.3 of the T&Cs.

46.     By way of the Termination Notice, Active8 has taken the position that this discontinuance and transition to the new Roller platform is merely just a modification that Active8 must be forced to accept.

47.     Pursuant to Tex. Civ. Prac. & Rem. Code ¶ 37.001 et seq., Plaintiff seeks a declaration of its rights in connection with the terms of the Parties' Software Agreement and the T&Cs. More specifically, Plaintiff seeks a declaration that Active8's conduct in terminating the Software and transitioning to the Roller platform is not a modification, but rather a permanent discontinuance of the Software; that EA did not breach the Software Agreement by refusing to accept the Roller platform software; that Active8 has no basis to terminate the Software Agreement "for cause"; and that it is required to terminate the Software Agreement "for convenience" as defined in the T&Cs.

48.     Pursuant to Tex. Civ. Prac. & Rem. Code ¶ 37.009, Plaintiff is entitled to recover its costs, including reasonable and necessary attorney's fees in connection with the prosecution of this lawsuit.

## VII.
## APPLICATION FOR TEMPORARY RESTRAINING ORDER

49.     Plaintiff incorporates the paragraphs hereinabove and hereinafter as if set forth verbatim herein.

50.     Plaintiff's Application for Temporary Restraining Order is authorized by Texas Civil Practice and Remedies Code Sec. 65.011 and Texas Rule of Civil Procedure 680, as all or part of the relief requested by Plaintiff requires the restraint of acts prejudicial to Plaintiff; because Defendant's conduct relates to the subject of pending litigation, which would render judgment in that litigation ineffective; and irreparable injury is threatened to Plaintiff's business. Therefore, injunctive relief is necessary to preserve the status quo and prevent immediate and irreparable injury to Plaintiff.

51.     Plaintiff will suffer immediate and irreparable harm unless the Court enters a temporary restraining order enjoining Defendants from retiring the Software.

52.     An applicant may seek a temporary restraining order to preserve the status quo of the subject matter of the litigation until a preliminary hearing can be held on an application for a temporary injunction. *See Cannan v. Green Oaks Apts., Ltd.*, 758 S.W.2d 753, 755 (Tex. 1988). For purposes of injunctive relief, the status quo is defined as "the last actual, peaceable, non-contested status that preceded the controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004).

53.     "The party applying for a temporary injunction 'must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable imminent, and irreparable injury in the interim.'" *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002).

**<u>A Cause of Action Against Defendants.</u>**

54.     As demonstrated herein, Plaintiff has causes of action against Defendants for breach of contract, and a declaratory judgment regarding the Parties' rights in relation to the Software Agreement and the T&Cs.

**A Probable Right to the Relief Sought.**

55.     A probable right to the relief sought is shown by alleging a cause of action and presenting evidence that tends to sustain it. *Tanguy v. Laux*, 259 S.W.3d 851, 856-57 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). Plaintiff has a probable right to the relief sought on its causes of action against Defendants because they are seeking to improperly terminate the Software Agreement without justifiable grounds, and therefore breach the Software Agreement by failing to provide the agreed upon Software. This breach is evidenced by Active8's Termination Notice. Furthermore, Plaintiff has a probable right to relief on its declaratory judgment action as the new software platform Defendants seek to force upon Plaintiff is not a "modification," but instead, Active8 is, in its own words, "retiring" the Software, or otherwise permanently discontinuing the Software, which, under the Software Agreement requires Defendant to continue providing the Software until the end of the current term of the Software Agreement.

**A Probable, Imminent, and Irreparable Injury in the Interim.**

56.     Plaintiff's harm is imminent as Active8 explicitly stated in the Termination Notice that Defendants intend to terminate the Software Agreement as of January 2, 2024, and will cease providing the Software to Plaintiff. If not enjoined, Defendants will deprive Plaintiff access to the Software and prevent Plaintiff from being able to operate its business.

57.     If Defendants are successful, Plaintiff will face irreparable injury for which there is no adequate remedy, as the disruption to its business practices would be insurmountable. An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *See Tel. Equip. Network v. Ta/Westchase Place*, 80 S.W.3d 601, 610-11 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

58.     Disruption to a business can be irreparable harm. *Lavigne v. Holder*, 186 S.W.3d 625, 629 (Tex. App.-Fort Worth 2006, no pet.) *David v. Bache Halsey Stuart Shields, Inc.*, 630 S.W.2d 754, 757 (Tex. App.-Houston [1st Dist.] 1982, no writ) ("This harm would not only disrupt the organized business dealings of Bache but would also threaten customer confidence in Bache's handling of their private affairs, and probably cause Bache to lose not only customers but profits as well.").

59.     "Moreover, assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy." *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App. 2009), citing *Martin v. Linen Sys. for Hosps., Inc.*, 671 S.W.2d 706, 710 (Tex.App.-Houston [1st Dist.] 1984, no writ).

60.     Plaintiff does not have an adequate remedy at law if Defendants revoke the Software. Plaintiff would be forced to temporarily close its business until it could find an alternate method of conducting transactions with its client. This cessation of business would result in the cancellation of hundreds of previously reserved birthday parties and other events. This business disruption will almost certainly cause Plaintiff to lose customers and lose business goodwill in the community, the impact of which is incalculable, and as such, injunctive relief is the only remedy available to cure these issues.

61.     Furthermore, Plaintiff does not have an adequate remedy at law for the injuries it suffered as the T&Cs contain a limitation of liability clause that makes any claims for economic damages Plaintiff has against Active8, even if calculable, ineffectual. The T&Cs state, "In no event shall Active8's maximum aggregate liability exceed the amount paid by Licensee to active8 for

the Service, to a maximum amount equal to the fees paid to Active8 by Licensee during the six (6) months preceeding [sic] the occurrence resulting in such liability." Ex. A-2, Sec. 9.

62.     Plaintiff's monthly fees to Active8 under the Software Agreement were $799 per month. Thus in accordance with the language of the T&C's, Plaintiff's maximum recovery for its damages would only amount to $4,794, which is far from an adequate remedy to cure the damages suffered by Plaintiff for Active8's breach of the Software Agreement. A party lacks an adequate remedy at law if the amount of damages recoverable are limited, and thus insufficient to cure the damages sustained by the underlying action. *See, Whatley v. City of Dallas*, 758 S.W.2d 301, 307 (Tex. App. – Dallas 1988, writ denied), *see also Liberty Mut. Ins. Co. v. Mustang Tractor & Equip. Co.*, 812 S.W.2d 663, 666-67 (Tex. App. – Houston [14th Dist.]).

63.     Therefore, Plaintiff requests the Court issue a Temporary Restraining Order, restraining Defendants, and their entities, agents, servants, employees, attorneys, and those persons in active concert or participation with Defendants from terminating the Software Agreement, or otherwise restricting Plaintiff's access to the Software throughout the duration of the current term of the Software Agreement.

64.     Plaintiff is willing to post bond.

## VIII.
## APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION

65.     Plaintiff incorporates the paragraphs hereinabove and hereinafter as if set forth verbatim herein.

66.     Plaintiff asks the Court to set its application for temporary injunction for hearing and, after the hearing, issue a temporary injunction against Defendants, enjoining Defendants from those actions set forth in the Application for Temporary Restraining Order, and for other actions

the Court may deem appropriate to protect Plaintiff from injury. Plaintiff has joined all indispensable parties under Texas Rule of Civil Procedure 39.

67.     Plaintiff asks the Court to set its request for permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction against Defendants, enjoining Defendants from those actions as set forth in the Application for Temporary Restraining Order, and for other actions the Court may deem appropriate to protect Plaintiff from injury.

## IX.
## MOTION FOR EXPEDITED DISCOVERY

68.     Plaintiff seeks expedited discovery pursuant to Texas Rule of Civil Procedure 191.1 from Defendant.

69.     Texas Rules of Civil Procedure 196.3(a) and 197.2(c) permit expedited written discovery upon the Court's order. Texas Rule of Civil Procedure 199.2(a) permits deposition testimony be taken outside the discovery period upon leave of the Court.

70.     Plaintiff seeks this discovery from Defendants before the Court's Temporary Injunction hearing. Plaintiff requests limited discovery to adequately prepare for the evidentiary burden it must meet at the Temporary Injunction hearing. Accordingly, good cause exists for the immediate entry of an order granting limited, expedited discovery from Defendants.

71.     Specifically, Plaintiff requests to conduct the following discovery before the hearing on its application for a Temporary Injunction:

  i.    Plaintiff shall be permitted to take the deposition of each of Defendants' corporate representatives, with said depositions lasting not more than three (3) hours. Plaintiff will notice the deposition on three (3) days' notice.
  ii.   Plaintiff shall be permitted to serve ten (10) requests for production on Defendants, with documents to be produced two (2) days before their deposition.
  iii.  Plaintiff shall be permitted to serve five (5) interrogatories on Defendants, which responses shall be provided to Plaintiff two (2) days before their deposition.

# **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendant

be cited to appear and answer herein and respectfully asks the Court to enter judgment for Plaintiff:

i. Issue a Temporary Restraining Order, restraining Defendants as requested herein;
ii. Set a date and time for hearing upon notice of this application for temporary injunction, and on such hearing, issue a temporary injunction as requested hereinabove;
iii. That upon final hearing or trial of this cause, entry of a final judgement awarding Plaintiff:
    a. a permanent injunction for the relief requested hereinabove;
    b. awarding Plaintiff its actual, direct, and consequential economic damages incurred as a result of Defendants' conduct;
    c. awarding Plaintiff its reasonable attorney's fees and costs in the presentation and prosecution of its claims through any and all appeals;
    d. an award of all legally recoverable interest at the maximum legal rate, and for the maximum period of time permitted by law on all amounts awarded to Plaintiff; and
    e. for such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

*/s/ Kirte M. Kinser*
Kirte M. Kinser
State Bar No. 11489650
kkinser@fbfk.law
Alexander M. Campbell
State Bar No. 24095536
acampbell@fbfk.law
Luc J. Whyte
State Bar No. 24135117
lwhyte@fbfk.law

FERGUSON BRASWELL FRASER KUBASTA PC
2500 Dallas Parkway, Suite 600
Plano, Texas 75093
T: 972-378-9111
F: 972-378-9115

ATTORNEYS FOR PLAINTIFF

## CERTIFICATION OF NOTICE

The undersigned counsel for Plaintiff hereby certifies that he has caused: (1) Defendants Active8 and Roller to be provided with copies of Plaintiff's Original Petition and Application for Temporary Restraining Order, and Temporary and Permanent Injunction and Motion for Expedited Discovery (the "Application"), proposed Order Granting Motion for Expedited Discovery, and proposed Temporary Restraining Order via email, at least, 2 hours before they are to be presented to the Court of decision; and (2) Defendants Active8 and Roller to be notified that the Application and proposed Orders will be presented to the Court and Plaintiff will inform Defendants of the date and time of the hearing on same once set.

_/s/Alexander M. Campbell_ 
Alexander M. Campbell

# EXHIBIT A

## DECLARATION OF ROBERT PAGANO

STATE OF NEW JERSEY  §
                                 §
COUNTY OF MORRIS  §

I, Robert Pagano, state as follows:

1.      My name is Robert Pagano. I am over the age of twenty-one years of age and competent to make the following declaration under penalty of perjury.  I am the Managing Member of Entertainment Affiliates, L.L.C. ("EA"). Through this role, I have learned the following facts and such facts are within my personal knowledge and are true and correct.

2.      EA is an affiliate of Rock 'N' Air Adventure Park ("Rock N Air") in East Brunswick, New Jersey. Rock N Air is an indoor adventure park for customers of all skill levels, with indoor attractions such as rock climbing walls, trampolines, laser tag, and other attractions.

3.      Rock N Air clients buy a pass to access the park's various amenities. Guests purchase these passes either online in advance or at the time of their arrival. Rock N Air is also a popular destination for group events such as birthday parties for children.  Party reservations are typically made through Rock N Air's online site.

4.      Every guest that accesses the park's attractions is required to have a signed waiver of liability. A pass can only be checked-in after it is assigned to an account with an active waiver of liability.

5.      Attached hereto as Exhibit A-1 is a true and correct copy of the contract ("Agreement") signed and executed between EA and Active8 Software. LLC ("Active8") executed as of April 7, 2021 as to a software program known as "Active8 Software," referred to also as "Active8 Platform" and defined in the Software Agreement as the "Services" ("Software"). The term of the Agreement is five (5) years.

6.      The Software is the lifeblood of Rock N Air's daily operations. It is a critical component to the success of the business. It enables guests to create an account, and sign the waiver, which information is stored  so upon check-in our employees can easily find  a guests account with a completed waiver and assign it to a pass . The Software also tracks a client's history at Rock N Air.

7.      The Software further coordinates all logistics of events scheduled at Rock N Air. Rock N Air is a popular birthday destination for children, and the Software is used to schedule and store information for the birthday parties to ensure the intake process proceeds smoothly when the guests arrive, including making sure that guests of the birthday party are joined to the proper party and all guests have signed waivers.

8.      After executing the Agreement, we spent thousands of dollars purchasing equipment compatible with the Software, including 12 point-of-sale ("POS") units throughout Rock N Air's facilities and 7 waiver stations. We also spent multiple days training our employees on how to use the Software and integrate it into our facilities. We require each new cashier employee to be trained on the Software before they can start working their position.

9.      We currently have 147 employees, with 54 currently trained and equipped to work with the Active8 Software.

10.      In addition to the Agreement, I signed Terms and Conditions (the "T&Cs") on behalf of EA, which were incorporated into the Agreement. Attached hereto as Exhibit A-2 is a true and correct copy of the T&Cs.

11.      On June 20, 2022, we received an email from Active8's CEO announcing that it has joined forces with Roller, an all-in-one management software company. The announcement

further stated that the Active8 Software would eventually be retired. A true and correct copy of this announcement is attached hereto as Exhibit A-4.

12.     We did not want to leave the Active8 platform, and even looked at Roller's platform before entering into the Agreement, but deemed Roller's platform was inferior and unsatisfactory for our purposes. As such, we engaged in discussions with Active8 to come up with creative solutions to keep Rock N Air operating on the Software as we agreed.

13.     The Roller platform is not useable for our purposes, and inferior to the Active8 Software in multiple regards, including:

    a.  Active8 provides an electronic invitation link to a party organizer when a party is booked.  The party organizer sends the link to their guests.  It directs a guest to complete a waiver and a ticket from the party is assigned to the guest.  Roller does not offer this feature.

    b.  Active8 has a very easy party check-in process.  All the parties are listed on the screen in a row based upon the time and the birthday child's name.  If you click on a party a screen appears with the assigned tickets (see #1 above). A simple click and a guest is checked-in.  Roller instead requires you to search for a party, and then search for a guest to assign a ticket from that party. Rock N Air often has over 80 guests checking in at the same time. To our knowledge, this cannot be completed with the same efficiency on the Roller platform.

    c.  With Active8 a party organizer has the ability to approve their guests that have assigned tickets in advance. The tickets can be  assigned and they can view this in their account. Roller does not provide the same guest verification processes that Active8's Software offers. A party package includes 10 tickets.  Each additional ticket over 10 is a charge to the party.  Not having the ability to assign a ticket in advance can create an unexpected expense to a party organizer.

    d.  Active8 has a calendar format by day showing all the party rooms.  It shows our 7 party rooms as they are located side-by-side.  It also shows available times for each room and if a party has been booked.  Roller has no calendar or easy way to view the parties.  This is a major feature we use to coordinate all aspects of the party from room location to food.

    e.  Active8 permits you to ban people from the park.  People are banned for the betterment of the park and other guests.  Roller has a feature that flags a guest, but they can still be checked-in by a cashier.

    f.  Roller has issues with tickets, accounts and linking them to waivers for open play, EA could not overcome these issues for intake purposes.

**DECLARATION OF ROBERT PAGANO**                           **Page 3**

14. We offered to purchase the Software from Active8 for our own personal use, and agreed we would not to sell or license the Software to anyone else, but Active8 would not agree to do so.

15. During discussions in good faith with Active8 Software to come to a reasonable resolution to resolve this matter, we received a Termination Notice from Active8's counsel on December 3, 2023, a true and correct copy of which is attached hereto as Exhibit A-5.

16. Currently, Rock N Air has over 170 parties and events booked through 2024 on the Active8 Software. We could not feasibly transition these events to a new platform and ensure all data was transitioned properly. This does not include over 500 gift cards with active balances that will be lost.

17. If we cannot use the Active8 Software, we cannot provide our services to our clients, and doing so would cause significant damage to our reputation in the community. I would not be able to determine the financial impact our company would face, as it would potentially put us out of business.

18. The ramifications for the goodwill of our business would be amplified if we have to cancel the children's birthday parties that have already been booked well in advance. For many of these parties, I anticipate it is too late to find a suitable alternative location to host these events.

19. In addition, we would have to fire our 147 employees which would amplify the injury caused by Active8's decision to deny us access to and use of the Software three years prior to the termination of the Contract.

Further Declarant sayeth not.

JURAT IN ACCORDANCE WITH TEX. CIV. PRAC. & REM. CODE § 132.001(d):

"My name is Robert Pagano, my date of birth is January 26, 1964, and my business address is 420 Boulevard, Suite 201, Mountain Lakes, New Jersey 07046. I declare under penalty of perjury that the foregoing is true and correct."

Executed in Morris County, New Jersey, on December 27th, 2023.

Robert Pagano

**EXHIBIT A-1**

# ACTIVE8 SOFTWARE AGREEMENT

This Software Agreement ("Agreement") is entered into as of _Apr 7, 2021_ by and between Active8 Software LLC, a Texas limited liability company, having its principal offices at 301 Leora Ln Suite 250, Lewisville, TX 75056 ("Active8") and _Entertainment Affiliates, L.L.C_, a(n) _limited liability company_ corporation, with offices located at _420 Boulevard, Suite 201, Mountain Lakes, New Jersey 07046_ ("Licensee").

Location Name: _Rock 'N' Air_

Monthly Fees and Discounts: $799 per month

> Included in this fee is an assigned account manager for the initial term of the agreement

> Facial recognition and texting features may be used for $5 per 1,000 transactions and $10 per 1,000 transactions, respectively.

> All of these fees will be charged monthly, starting at Software Go-Live, and each month thereafter on the anniversary date.

> The Base Fee includes an unlimited number of users, point of sale stations, waiver stations and signed waivers per Location.

Initial Setup Fee Per Location: $3,000

- Product, package, and time slot setup will be done with remote Active8 assistance ($1,500)
- 2 consecutive days of on-site services will be provided ($1,500)

Initial Setup Timeline:

> The park will begin onboarding by April 12, 2021

> The park will have an expected Software Go-Live of _____

> The park will have an expected Go-Live of _____

> To maintain these timelines, customer must provide feedback during the timeframes provided during the onboarding process.

Hardware: Can be ordered at any time.

Payment Terms: All payments are billed immediately to the account listed below.

Initial Term: Five (5) years

> Agreement shall automatically renew for additional one (1) year periods after initial term.

Active8 Initial
Licensee Initial

Other Terms and Conditions:  Licensee agrees to use the Active8 Service in accordance with the Active8 terms and conditions, located at www.active8software.com/terms.

AGREED TO AND ACCEPTED BY:

ACTIVE8 SOFTWARE, LLC

_____
SIGNATURE

Name: Gregory Spittle

Title: CEO

Date: Apr 8, 2021

AGREED TO AND ACCEPTED BY:

Entertainment Affiliates, L.L.C (LICENSEE)

_Robert M. Pagano_
Robert M. Pagano (Apr 7, 2021 23:33 EDT)
_____
SIGNATURE

Name: Robert M. Pagano

Title: Managing Member

Date: Apr 7, 2021

E-Check Authorization

Name on Bank Account: _____

Billing Address: _____

Contact Phone Number: _____

Bank Account Number: To be provided

Bank Routing Number: To be provided

Invoice Contact Information

Name: Robert Pagano

Email: robert@rocknair.com

Phone Number: 201-417-2020

Active8 Initial
Licensee Initial

# Active8 Contract

**Final Audit Report**                                                          2021-04-08

| | |
|---|---|
| Created: | 2021-04-07 |
| By: | Gregory Spittle (greg@active8pos.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAAK4oolAGAPhUGUwhzwGPDb9YLBfAYQjL |

# "Active8 Contract" History

📄 Document created by Gregory Spittle (greg@active8pos.com)
2021-04-07 - 7:50:20 PM GMT- IP address: 47.190.51.20

✉ Document emailed to Robert M. Pagano (robert@rocknair.com) for signature
2021-04-07 - 7:53:29 PM GMT

📄 Email viewed by Robert M. Pagano (robert@rocknair.com)
2021-04-07 - 9:16:25 PM GMT- IP address: 96.56.195.58

🖋 Document e-signed by Robert M. Pagano (robert@rocknair.com)
Signature Date: 2021-04-08 - 3:33:26 AM GMT - Time Source: server- IP address: 96.56.195.58

✉ Document emailed to Gregory Spittle (greg@active8pos.com) for signature
2021-04-08 - 3:33:28 AM GMT

📄 Email viewed by Gregory Spittle (greg@active8pos.com)
2021-04-08 - 3:23:54 PM GMT- IP address: 47.190.51.20

🖋 Document e-signed by Gregory Spittle (greg@active8pos.com)
Signature Date: 2021-04-08 - 4:38:41 PM GMT - Time Source: server- IP address: 47.190.51.20

✅ Agreement completed.
2021-04-08 - 4:38:41 PM GMT



POWERED BY
Adobe Sign

# EXHIBIT A-2

## ACTIVE8 TERMS AND CONDITIONS

Active8 Software LLC (Active8) has developed a software application, offered as a Service under these Terms and Conditions and any associated Contract, and as defined below and described in more detail in Exhibits A, B, and C.

Licensee agrees that use of any Active8 or third party features, services, or content as may be supplied by Active8, either in or accessible through the Service shall be subject to any applicable Active8 terms and conditions.

Licensee agrees to use the Service solely for the Purpose in accordance with the following terms and conditions:

### 1.0    Definitions

1.1     Agreement means these terms and conditions and any additional terms set forth and signed between the parties, including those in an associated Contract.

1.2     Confidential Information means any information of a Party (including Licensee Content and Registration Data) that is designated as confidential or proprietary at the time of disclosure, or would be reasonably considered as confidential due to its nature or circumstance of disclosure.

1.3     Contract means a signed document between the parties that identifies the Term of the Agreement, as well as other specific terms and conditions, and incorporates the terms and conditions contained herein by reference.

1.3     Active8 Content means any messages or other communications or other information, data, text (including but not limited to names of files, databases, directories and groups/workgroups of the same), software, music, sound, photographs, graphics and video transmitted, entered, or stored by Active8, into and as part of the Service.

1.4     Licensee Content means all Licensee and User information or data that is input or uploaded by or on behalf of Licensee and/or Users into the Service, and shall include any messages or files, pages, data, works, information and/or materials on, within, displayed, linked or transmitted to, from or through the Service, including, without limitation, trade or service marks, images, photographs, illustrations, graphics, audio clips, video clips email or other messages, metatags, domain names, software and text or other communications or other information, data, text (including but not limited to names of files, databases, directories and groups/workgroups of the same), software, sound, photographs, graphics and video transmitted, entered, or stored by any User or any other Licensee employee, contractor, assigns or representative using the Service.

1.5     Registration Data means the information provided by an authorized Licensee representative on any associated online Service registration form(s).

1.6     Seat means the license for a User or license for a Location, based upon the specified fee structure, to have access to the Service on a monthly basis in accordance with the terms of the Agreement and subject to Licensee's payment of the applicable Fees.

1.7     Service means the Active8 product or application, including any modifications or updates thereto if and as made generally available by Active8, and as described in more detail in Exhibit A.

1.8     "SLA" has the meaning set forth in Section 2.5 below.

1.9     "SLA Default" has the meaning set forth in the SLA.

1.10    "Technical Support" has the meaning set forth in Section 2.3.2 below.

1.11    User means those individual employees or contractors of Licensee, whom Licensee shall allow to use the Service in accordance with the Agreement.

### 2.    License Grant; Active8 Obligations; Restrictions

2.1     License Grant by Active8.

(a) Subject to the terms of the Agreement and Licensee's payment of the applicable Fees (including the required Fees Seat), Active8 grants Licensee a limited, non-exclusive, non-transferable, revocable license during the Term to access and use (and to permit its Users to access and use, subject to the number of Seats for which Licensee has paid the required Fees) the Service for Licensee's own business purposes, but not otherwise, and solely for use within the United States, subject to the terms and conditions of the Agreement and in accordance with the pricing and payment terms set forth below. In addition, except as otherwise expressly agreed to in writing by Active8, the foregoing license is limited solely to use by the number of Seats for which Licensee has paid the applicable Fees stated below.

(b) Licensee hereby assumes full responsibility for all use by the Users and shall be solely responsible for ensuring that the Users comply with the terms of the Agreement, including but not limited to the confidentiality and scope of use obligations and the license grant restrictions set forth below.

(c) All rights not expressly granted to Licensee herein are reserved by Active8 and its licensors. Licensee agrees that the Services, including related materials or documentation, and any other information identified by Active8 as confidential or proprietary are "Active8 Confidential Information."

2.2 License Grant by Licensee. Licensee grants to Active8, and Active8 accepts from Licensee, a limited, non-transferable, non-exclusive, worldwide and royalty free license, for the term of the Agreement, to access, store, copy, display, use and transmit on and via the Internet and the Service the Licensee Content.

2.3 Active8 Obligations.

2.3.1 Hosted Service. Active8 will make available to Licensee, or shall engage a third party to make available to Licensee on Active8's behalf, hosted access to the Service. The Service shall be installed and hosted at Active8's data centers(s) and/or at such third party data center(s), as Active8 may elect from time to time, and the Service shall be made available through the Internet for use by Licensee in accordance with the terms of the Agreement. Active8 shall be responsible, at its expense, for procuring and maintaining such data center, or such third party hosting services during the Term.

2.3.2 Technical Support. During the Term, any reasonable technical support that may be provided by Active8 shall be as described in the SLA ("Technical Support") and subject to Licensee's payment of the applicable Fees.

2.3.3 Communications Choices. Active8 may be required by law to send Licensee communications about the Service or third party products. Licensee agrees that Active8 may send such communications to Licensee via email.

2.4 Restrictions. Licensee agrees (on behalf of itself and its Users) not to disclose to, sell to, make any copies of, resell, rent or sublicense (including offering the Service to third parties on an applications service provider or time-sharing basis), lease, loan, redistribute, or create a derivative work of any portion of the Service, use of the Service, or access to the Service, or allow any third party to access or use the Service in whole or in part, except as expressly allowed under the terms of the Agreement. The Agreement does not authorize Licensee to make any modifications to or adaptations of any part or whole of the Service and any such modification or adaptation is expressly prohibited. Licensee agrees not to decompile, disassemble, or otherwise reverse engineer the Service. Such restrictions do not apply to Licensee Content placed on the Service, if any. Licensee agrees not to access the Service by any means other than through the interface that is provided by Active8 for use in accessing the Service, and further agrees not to send or store material containing software viruses, worms, Trojan horses or other harmful computer code, files, scripts agents, or programs, on the Service. Licensee may not access or use the Service for purposes of monitoring Service availability, Service performance or functionality, or for any benchmarking, or competitive purpose.

2.5 Service Level Agreement. All matters concerning availability of the Service, data backup, Technical Support and related concepts are addressed in the Service Level Agreement ("SLA") set forth under Exhibit B. The SLA shall govern the Service. To the extent, if any, that Active8 commits a SLA Default (as defined in the SLA), then Licensee shall be entitled to exercise its termination right pursuant to Section 12.2.2(b) below.

**3.    Licensee Obligations.**

3.1 Compliance with Law. Licensee is responsible for all activities conducted within User accounts in use of the Service. Licensee shall comply with all applicable local, state, federal and regional or other laws and regulations applicable in connection with use of the Service, including all those related to data privacy and the transmission of technical or personal data. Licensee shall ensure that all Licensee Content does not violate any laws or regulations or infringe any intellectual property, privacy, publicity or other proprietary right of any person.

3.2    Registration.  Licensee agrees to (i) provide true, accurate, current and complete Registration Data, as applicable, and (ii) maintain and promptly update the Registration Data to keep it true, accurate, current and complete.  If Licensee provides any information that is untrue, inaccurate, not current or incomplete, or Active8 has reasonable grounds to suspect that such information is untrue, inaccurate, not current or incomplete, Active8 may suspend or terminate Licensee's account and refuse any and all current or future use of the Service (or any portion thereof).

3.3    Password(s).  Licensee agrees it and its Users shall securely manage its password(s) for access to the Service. Licensee agrees it shall notify Active8 immediately in the event of any unauthorized access or use of the Service, or of any password or account, or any other known or suspected breach of security in connection with the Service.

3.4    Copies; Distribution.  Licensee agrees it shall (i) notify Active8 immediately in the event of any known or suspected attempt to copy or distribute the Service, and (ii) use reasonable efforts to stop such attempted copying or distribution.

3.5    False Information.  Licensee agrees (i) it shall not, and shall cause its employees and contractors to not, impersonate any other User of the Service or provide false identity information in order to gain access to or to use the Service; and (ii) in the event that Licensee becomes aware of or suspects such impersonation or use of false information to gain access to or use the Service, Licensee (a) shall immediately notify Active8 of such actions and (b) shall use reasonable efforts to stop such improper access to or use of the Service.

3.6    Updates.  Active8 may update the Service periodically with tools, utilities, improvements, third party applications, or general updates to improve and enhance the features and performance of the Service. Licensee agrees to receive such updates automatically as part of the Service.

**4.    Confidentiality**

4.1    All Active8 Confidential Information, the Service, and any materials furnished to Licensee by Active8 and any information or materials which are designated in writing to be the property of Active8 shall remain the sole property of Active8. Any information related to Active8, or its business activities (including, but not limited to, all pricing, rates, fee schedules and Active8 Content, if any), that is made available to, received, observed or otherwise obtained by Licensee in connection with the Agreement shall be treated by Licensee as Active8 Confidential Information and shall not be used, disclosed or further disseminated by Licensee. Licensee agrees that any unauthorized disclosure of the Active8 Confidential Information would cause irreparable harm to Active8, and that in the event of any breach or threatened breach of the confidentiality obligations, Active8 shall be entitled to seek equitable relief in addition to any other remedy.

4.2    To the extent that Licensee provides any information to Active8, arising from Licensee's use of the Service, Licensee warrants that (i) Licensee is providing only Licensee's own information or the information of others which Licensee is authorized to provide on their behalf to third parties; and (ii) the use of such information by Active8 will not infringe or misappropriate the intellectual property rights or otherwise violate the rights of any third parties.

4.3    Confidential Information shall not include, or shall cease to include, as applicable, information or materials that (i) were generally known to the public on the execution date of the Agreement; (ii) become generally known to the public after the execution date, other than as a result of the act or omission of the receiving party; (iii) were rightfully known to the receiving party prior to its receipt thereof from the disclosing party; (iv) the receiving party lawfully received from a third party without that third party's breach of agreement or obligation of trust; or (v) are independently developed by the receiving party.

4.4    Either Party may disclose or report Confidential Information in limited circumstances where such Party believes, in good faith, that disclosure is required under the law.  For example, Active8 may be required to disclose Confidential Information to cooperate with regulators or law enforcement authorities, to comply with a legal process such as a court order, subpoena, search warrant, or a law enforcement request.

4.5    Screening, Removal & Risk of Licensee Content.

4.5.1    Active8 does not pre-screen Licensee Content, but Active8 and its designees, contractors or subsidiaries shall have the right (but not the obligation) in their sole discretion to refuse or to remove any Licensee Content that is available via the Service.  Without limiting the foregoing, and without notice, Active8 and its designees shall have the right to remove any Content that is deemed objectionable by Active8 in its sole discretion. Unless the Licensee Content is illegal material or represents, in Active8's reasonable discretion, inappropriate or objectionable content, Active8 will make commercially reasonable efforts to notify Licensee prior to such removal.  Any Licensee Content removed under this Section 4 will be stored

by Active8 for a reasonable period of time and Active8 will provide Licensee with prompt notice of such removal and the reasons therefore.

4.5.2    Licensee shall evaluate and bear all risks associated with the use of any Licensee Content including any reliance on the accuracy, completeness, or usefulness of such Licensee Content.

## 5.    Intellectual Property Ownership.

5.1    The Service. Active8 owns all right, title and interest, including all intellectual property rights, in and to the Service and its technology.  Licensee acknowledges and agrees that Licensee may be providing and submitting feedback, suggestions and ideas ("Feedback") relating to the features and functionality of the Service to Active8 which Active8 may use in future modifications and/or subsequent versions of the Service, if any, multimedia works and/or advertising and promotional materials relating thereto.  Licensee hereby assigns to Active8 a perpetual, worldwide, fully transferable, sub-licensable, non-revocable, fully paid-up, royalty free license to use, modify, create derivative works from, distribute, display and otherwise exploit any information it provides to Active8 in the Feedback.  Notwithstanding the foregoing sentence, the parties agree that nothing in the Agreement is intended to assign or transfer to a party, nor will have the effect of assigning or transferring to a party, any Licensee Confidential Information, any right to any existing copyright, patent, trade secret, moral right, or any other existing intellectual property right of the other party.

5.2    Active8 Name and Logo. Active8's name and logo and all Active8 product and services names, including the name of the Service and any product or service associated with it, are trademarks of Active8 or its licensors, and no right or license to use such materials is granted in the Agreement.

5.3    Active8 Content.  Licensee acknowledges and agrees that any and all Active8 Content, including copyrights, trademarks, database rights and other intellectual property contained in such Active8 Content are owned by Active8.  Any access to Active8 Content which Licensee may have is only incidental to Licensee's access to the Service in a manner that is in accordance with the license set forth in Section 2 above, and is therefore subject to the terms of the Agreement. Licensee does not obtain any right, title or interest in any Active8 Content.

5.4    Limited Use of Licensee Marks. Licensee grants Active8 the right to use Licensee's name and logo in connection with marketing collateral produced for publicity about the Service. Active8 agrees to provide to Licensee such marketing collateral for Licensee's review and approval prior to release by Active8.

5.5    Reservation of Rights. Except for the license expressly granted in the Agreement, Active8 grants no other rights, licenses or privileges to Licensee. No implied licenses are granted by Active8 with respect to any intellectual property owned or controlled by Active8.

## 6.    Fees and Payment.

6.1    Fees.  Licensee shall pay all fees in accordance with the pricing and invoicing terms as set forth in the Agreement (collectively, the "Fees"), attached hereto and incorporated herein by reference. All payment obligations are non-cancelable and all Fees and other amounts paid are nonrefundable, in whole or in part, regardless of any SLA Default or whether the Service is suspended, cancelled, or transferred prior to the end of any current Term of the Agreement. Licensee is responsible for payment of all Fees regardless of whether its Users actually access or use the Service. The number of Seats may be increased following execution of the Agreement by by payment of the applicable Fees. Paying the onboarding fee for any location, will be deemed to have added that location as a Seat to the Agreement. Payment for such additional Seats is required to be made in full and in advance before any such additional Users are permitted access to or use of the Service. After the Initial Term, Active8 reserves the right to modify its pricing and Fees annually, in its sole discretion upon notice to Licensee.

6.2    Expenses and Costs. In addition to any Fees owed pursuant to the Agreement, Licensee shall reimburse Active8 for pre-approved travel related expenses, if any. If Licensee has requested any development items under an SOW and decides to terminate the SOW or this agreement, Licensee will be responsible for the full cost of any work done on those development items prior to termination.

6.3    Taxes.  All fees and costs payable under the Agreement are net amounts and are payable in full, without deduction for taxes or duties of any kind.  Sales taxes will be included on the invoice or in the credit card payment.  Licensee will be responsible for, and will promptly pay, all taxes and duties of any kind (including but not limited to sales, use and withholding taxes), if any, associated with the Agreement or Licensee's receipt or use of the Service, except for taxes based on Active8's net

income.  In the event that Active8 is required to collect or pay any tax for which Licensee is responsible, Licensee will pay such tax directly to Active8.  If Licensee pays any withholding taxes that are required to be paid under applicable law, Licensee will furnish Active8 with written documentation of all such tax payments, including receipts.

6.4     Payment.

6.4.1  Invoices.  Active8 shall bill all Fees in advance, in accordance with Exhibit A. Licensee shall pay Active8 all expenses within thirty (30) days of the date of Active8's invoice. If Licensee fails to timely pay any amount due under the Agreement, whether by acceleration or otherwise, Licensee, upon demand, shall pay, in addition, interest at the rate of two percent (2%) per month, but not to exceed the maximum allowed by law, on such delinquent amount from the due date thereof until the date of payment.  All payments must be sent to:  Active8 Software LLC, PO Box 560623, The Colony, TX 75056, or such other location designated by Active8. Without limiting the foregoing, if Licensee fails to pay any amount when due, Active8 reserves the right, with written notice of 15 days, to suspend all or part of Licensee's (and its Users') access to the Service and Licensee Content and any related technical support and training, terminate the Service and any related technical support and training, and/or terminate the Agreement. Without limiting the foregoing, if Licensee abandons the system, without paying the full amount due under the contract, Active8 reserves the right, without notice, to suspend all or part of Licensee's (and its Users') access to the Service and Licensee Content and any related technical support and training, terminate the Service and any related technical support and training, and/or terminate the Agreement.

6.4.2  Automatic Payments. If Licensee chooses to pay monthly, a bank account must be provided that will be automatically billed for the services that will be provided during the month. If the withdrawal is denied for insufficient funds, a fee of two percent (2%) will be added to the invoice.  In some instances, Active8 may allow Licensee to pay with a credit card, but only in Active8's sole discretion. Additionally, if Licensee fails to pay any amount due under the Agreement, whether by acceleration or otherwise, Licensee, upon demand, shall pay, in addition, interest at the rate of two percent (2%) per month, but not to exceed the maximum allowed by law, on such delinquent amount from the due date thereof until the date of payment.

**7.      Representations and Warranties; Warranty Disclaimer.**

7.1      Each party to the Agreement represents and warrants that: (i) it has the legal authority to enter into and perform in connection with the Agreement; and (ii) it shall comply with all laws and regulations applicable to the performance of its obligations hereunder and shall obtain all applicable permits and licenses required of it in connection with its obligations hereunder.

7.2      Active8 represents and warrants that: it owns the Services or otherwise has the rights to grant the licenses granted to Licensee hereunder; and will exercise reasonable efforts to avoid the introduction of code that is known to disrupt, damage or interfere with any Licensee use or Licensee's computer and communications facilities or equipment ("Harmful Code"). "Harmful Code" shall include, without limitation, any code containing viruses, Trojan horses, worms or like destructive code or code that self-replicates.

7.3      Licensee represents and warrants that: (i) it and its Users will not violate the license terms or restrictions for the Service, (ii) it will not resell use of or access to the Service, unless expressly permitted, (iii) it owns or controls the Licensee Content and has the right to exercise and grant any rights with respect thereto, (iv) all information provided in connection with Licensee's registration is accurate and reliable, (v) it will be responsible for its own backup and storage of Licensee Content that is maintained outside of the Service, and (vi) it and its Users will not introduce any Licensee Content or other material that violates any law, right of any person or the terms of the Agreement.

7.4      LICENSEE'S ACCESS TO AND USE OF THE SERVICE IS AT LICENSEE'S AND ITS USERS' SOLE RISK.  THE SERVICE IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. ACTIVE8 AND ITS SUPPLIERS MAKE NO WARRANTY THAT (i) THE SERVICE WILL MEET LICENSEE'S REQUIREMENTS OR RESULT IN REVENUES OR PROFITS, (ii) THE SERVICE WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE, (iii) THE RESULTS THAT MAY BE OBTAINED FROM THE USE OF THE SERVICE WILL BE TIMELY, ACCURATE OR RELIABLE, AND (iv) THE QUALITY OF ANY PRODUCTS, SERVICE, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY LICENSEE THROUGH THE SERVICE WILL MEET LICENSEE'S EXPECTATIONS. WHILE ACTIVE8 WILL USE COMMERCIALLY REASONABLE EFFORTS TO PREVENT UNAUTHORIZED ACCESS TO DATA ENTERED INTO "RESTRICTED FIELDS" (DEFINED FOR PURPOSES OF THE AGREEMENT AS FIELDS ACCESSIBLE ONLY VIA LICENSEE-ENABLED AND CONTROLLED PERMISSIONS) WITHIN THE SERVICE, ACTIVE8 AND ITS SUPPLIERS MAKE NO WARRANTY THAT SUCH RESTRICTED FIELDS WILL BE SECURE AGAINST SUCH UNAUTHORIZED ACCESS OR OTHER SECURITY BREACHES.  ACTIVE8 AND ITS SUPPLIERS MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, IN

CONNECTION WITH THE SERVICE, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT, UNLESS SUCH REPRESENTATIONS AND WARRANTIES ARE NOT LEGALLY EXCLUDABLE. ACTIVE8 EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES THAT LICENSEE'S USE OF THE SERVICE WILL SATISFY ANY STATUTORY OR REGULATORY OBLIGATIONS, OR WILL ASSIST WITH, GUARANTEE OR OTHERWISE ENSURE COMPLIANCE WITH ANY APPLICABLE LAWS OR REGULATIONS.

ANY MATERIAL DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF THE SERVICE IS DOWNLOADED OR OBTAINED AT LICENSEE'S OWN DISCRETION AND RISK AND LICENSEE WILL BE SOLELY RESPONSIBLE FOR ANY DAMAGE TO LICENSEE'S COMPUTER SYSTEM OR LOSS OF DATA THAT RESULTS FROM THE DOWNLOAD OF ANY SUCH MATERIAL.

NO ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED BY LICENSEE FROM ACTIVE8 OR THROUGH OR FROM THE SERVICE SHALL CREATE ANY WARRANTY NOT EXPRESSLY STATED IN THE AGREEMENT.

THE SERVICE MAY BE SUBJECT TO DELAYS, FAILURES, LIMITATIONS, AND OTHER PROBLEMS CONNECTED WITH USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS. ACTIVE8 IS NOT RESPONSIBLE FOR, AND SHALL NOT BE LIABLE FOR, ANY SUCH DELAYS, FAILURES OR DAMAGE RESULTING THEREFROM.

**8.     Indemnification.**

8.1     Active8 Indemnity.  Active8 will defend and indemnify Licensee against any action brought against Licensee by a third party to the extent that it is based upon a claim that the Service (excluding the Licensee Content), as made available by Active8 to Licensee under the Agreement and used within the scope of the Agreement, infringes any U.S. copyright, trademark or trade secret, and will pay any costs, damages and reasonable attorneys' fees attributable to such claim that are awarded either by final judgment or settlement against Licensee, provided that Licensee: (i) promptly notifies Active8 in writing of the claim; (ii) tenders to Active8 (in writing) the sole control of the defense and settlement of the claim; and (iii) provides Active8, at Active8's expense, with all assistance, information and authority reasonably required for the defense and settlement of the claim. Notwithstanding the foregoing, Active8 will have no liability for any infringement or misappropriation claim of any kind to the extent that it results from: (a) modifications to the Service made by a party other than Active8 or its agents, if a claim would not have occurred but for such modifications; (b) the combination, operation or use of the Service with systems, equipment, devices, software or data not supplied by Active8 or specified in the Documentation, if a claim would not have occurred but for such combination, operation or use; (c) failure to use an updated or modified version of the Service if provided by Active8 to avoid a claim; (d) use of the Service in a manner that violates applicable law or for a purpose that violates applicable law, (e) the Licensee Content, and/or (f) use of or access to the Service by any of Licensee's Users (regardless of whether such Users are authorized or unauthorized by Licensee).   The provisions of this Section 8.1 set forth Active8's sole and exclusive obligations, and Client's sole and exclusive remedies, with respect to infringement or misappropriation of intellectual property rights of any kind in connection with the Service.

8.2     Licensee Indemnity. Licensee agrees to indemnify, defend and hold harmless Active8, its subsidiaries and Affiliates, and its and their directors, officers, agents, assigns and employees ("Indemnitees"), from any claim or demand, including reasonable attorneys' fees, made by any third party due to or arising out of or related to any Licensee Content; Licensee's use (and its Users' use), misuse of or access to the Services; Licensee's connection to the Service; Licensee's and/or its Users' violation of the Agreement or the applicable Terms of Service; or Licensee's violation of any proprietary or other rights of a third party or any User; or Licensee's or Users' violation of applicable law. Indemnitees are not liable or responsible in any way for any errors, omissions or any other actions arising out of or related to Licensee's and/or User' use of or access to the Services or the Licensee Content.  If Licensee is a registered entity and permits Licensee's Affiliates, subsidiaries, employees, and/or any third party to access and/or use the Service and/or Licensee Content, Licensee shall be solely responsible for (i) their acts and/or omissions in connection with their access and/or use of the Service and (ii) ensuring that their access and/or use of the Service is in compliance with the Agreement, and any and all applicable local laws, rules and regulations.  Licensee agrees to fully indemnify Active8 and its affiliates, subsidiaries, licensors, and online service providers (collectively, "Representatives") for any liability, fines, penalties, costs, claims and/or damages incurred by Active8 and/or the Representatives in connection with any claim related to the access and/or use of the Service and/or Licensee's Content by Licensee, Licensee's Affiliates, subsidiaries, employees or any third-party authorized by Licensee.

**9.     Limitation of Liability.** ACTIVE8 AND ITS SUPPLIERS SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO, DAMAGES FOR LOSS OF PROFITS, GOODWILL, USE, DATA OR OTHER INTANGIBLE LOSSES (EVEN IF ACTIVE8

HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), RESULTING FROM: (i) THE USE OR THE INABILITY TO USE THE SERVICE; (ii) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS AND SERVICE RESULTING FROM ANY GOODS, DATA, INFORMATION OR SERVICE PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICE; (iii) UNAUTHORIZED ACCESS TO OR ALTERATION OF LICENSEE TRANSMISSIONS OR DATA; (iv) STATEMENTS OR CONDUCT OF ANY THIRD PARTY ON THE SERVICE; OR (v) ANY OTHER MATTER RELATING TO THE SERVICE.

ACTIVE8 WILL NOT BE LIABLE FOR ANY (a) INTERRUPTION OF BUSINESS, (b) ACCESS DELAYS OR ACCESS INTERRUPTIONS TO THIS SITE OR THE WEB SITE(S) LICENSEE ACCESSES THROUGH THIS SERVICE; (c) DATA NON-DELIVERY, MIS-DELIVERY, CORRUPTION, DESTRUCTION OR OTHER MODIFICATION; (d) UNAUTHORIZED ACCESS TO DATA ENTERED IN, OR BREACH OF ANY SECURITY MECHANISMS UTILIZED IN THE SERVICE OR IN ANY RESTRICTED FIELD THEREIN; OR (e) EVENTS BEYOND ACTIVE8'S REASONABLE CONTROL.

IN NO EVENT SHALL ACTIVE8'S MAXIMUM AGGREGATE LIABILITY EXCEED THE AMOUNT PAID BY LICENSEE TO ACTIVE8 FOR THE SERVICE, TO A MAXIMUM AMOUNT EQUAL TO THE FEES PAID TO ACTIVE8 BY LICENSEE DURING THE SIX (6) MONTHS PRECEEDING THE OCCURRENCE RESULTING IN SUCH LIABILITY.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF CERTAIN WARRANTIES OR THE LIMITATION OR LIMITATION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES IN CERTAIN CIRCUMSTANCES. ACCORDINGLY, SOME OF THE ABOVE LIMITATIONS MAY NOT APPLY TO LICENSEE.

THE PARTIES AGREE THAT THE FOREGOING PROVISIONS REPRESENT A FAIR AND EQUITABLE ALLOCATION OF RISK WITHOUT WHICH THEY WOULD NOT HAVE ENTERED INTO THE AGREEMENT.

**10.     Service Modifications.** Active8 reserves the right at any time and from time to time to modify the Service (or any part thereof) with or without notice and without altering the material functionality of the Service. Such modifications would be made to correct errors, improve performance, etc. In the event Active8 reasonably believes that any such modification could adversely affect all then-current licensees of the Service then Active8 will inform Licensee of such planned modification in advance and make such modification in a manner to minimize any such adverse effect. Should Active8 choose to permanently discontinue the Service, Active8 (i) will exercise its right to terminate the Agreement for convenience pursuant to Section 12.2.3 below, and (ii) will post notification of such decision on the Service web site thirty (30) days prior to such discontinuance. Active8 will not be liable to Licensee or to any User or third party for any modification, suspension or discontinuance of the Service, or for any resulting loss or destruction of any Licensee Content that Licensee placed on the Service after the date of such notice. Active8 may specify in writing from time to time the version(s) of related products required in order to use the Service (e.g., supported browser versions etc.).

**11.     Intentionally Left Blank**

**12.     Term, Termination & Post Termination.**

12.1     Term.  The "Initial Term" of the Agreement is will be set forth in an associated Contract, unless earlier terminated by either party pursuant to this Section 12, or as otherwise set forth in any Exhibit or Schedule under the Agreement.

12.2     Termination by Either Party.

12.2.1  Termination for Cause.  (a) Either party may terminate the Agreement upon thirty (30) days' written notice if the other party breaches the Agreement and fails to cure such breach within thirty (30) days after receiving written notice thereof from the non-breaching party. (b) In addition, Licensee may terminate the Agreement for cause upon thirty (30) days' written notice to Active8 in the event of failure to cure an SLA Default (as defined in the SLA, Exhibit B) within ten (10) business days.

12.2.3  Termination for Convenience. Either party may terminate the Agreement for any or no reason, at the end of the then current term, by sending written notice ninety (90) days, prior to the end of the then-current term, to the other party subject to Section 12.5 and Licensee's fulfillment of its payment obligations through the end of the then-current Term.

12.3     Suspension.  Active8 may, in its sole discretion, suspend or terminate Licensee's account and/or deny access to, use of, or submission of Licensee Content for, all or part of the Service, without liability, obligation, notice or otherwise, if Licensee engages in any conduct that Active8 reasonably believes:  (i) violates any provision of the Agreement or any law, (ii) violates the rights of Active8 or third parties, or (iii) is otherwise inappropriate for continued access and use of the Service.  In addition,

Active8 reserves the right to terminate any account if that account has been inactive for greater than three hundred and sixty-five (365) days. Lastly, Active8 reserves the right to suspend or terminate Licensee's account and/or deny access to, use of, or submission of Licensee Content for, all or part of the Service, without liability, obligation, notice or otherwise, pursuant to Section 6.4 above.

12.4    Responsibilities Upon Termination. Upon any termination of the Agreement, and without limiting any other provision hereof: (i) all of Active8's obligations to host and otherwise provide access to the Licensed Software and the Service shall fully and finally cease and Active8 shall have no further obligations in that respect after the 30-day transition period that begins on the day notice is given, (ii) each party shall destroy the other party's Confidential Information, or return it at the other party's request and expense; (iii) Licensee shall pay to Active8 all unpaid Fees and expenses due Active8; (iv) any and all licenses granted under the Agreement shall immediately and automatically terminate; (v) Licensee shall (and shall require its Users to) cease use of and access to the Service after the 30-day transition period; (vi) except in the event of insolvency of Licensee, Licensee shall, at Active8's election, either promptly return to Active8 or destroy all Confidential Information, copies of any software, or third party software, if any, and all other materials, whether tangible or intangible, furnished by Active8 pursuant to the Agreement, (viii) Licensee will pay all such amounts due Active8 in full, (ix) during the 30-day transition period Active8 will furnish Licensee with a Microsoft Excel spreadsheet (or other applicable Microsoft Office product) containing that portion of Licensee Content that existed in the Service at the time notice was given, and (x) subject to item (ix) above Active8 shall not be liable to Licensee, its Users or any third party for any suspension or termination of access to the Service. Notwithstanding the foregoing, if Active8 terminates the Agreement for convenience pursuant to Section 12.2.3, Licensee shall only be responsible for the payment of any and all Fees and expenses due through the effective date of such termination.

12.5    Survival.  The provisions of Sections 1 ("Definitions"), 2.4 ("Restrictions"), 4 ("Confidentiality; Licensee Content; Disposition of Licensee Content upon Termination"), 5 ("Intellectual Property Ownership"), 6 ("Fees, Invoicing and Payment"), 7 ("Representations and Warranties; Warranty Disclaimer"), 8 ("Indemnification"), 9 ("Limitation of Liability"), 10 ("Service Modifications"), 12.4 ("Responsibilities Upon Termination"), this Section 12.5 ("Survival"), 14 ("General Provisions"), and any exhibit, addenda or attachment that, by its nature, survives termination, shall survive any termination or expiration of the Agreement.

**13.    Intentionally Left Blank.**

**14.    General Provisions.**

14.1    Choice of Law.  The Agreement shall be governed in all respects by the internal laws of the State of Texas excluding its conflicts or choice of law provisions and Licensee agrees to submit to personal jurisdiction in the State of Texas, County of Denton.

14.2    Notices.  Notices between the parties shall be by personal delivery, overnight delivery, or certified or registered mail, return receipt requested, and shall be deemed given upon receipt at the address of the recipient party. Addresses used shall be the ones set forth herein or such other address as a party hereto shall notify the other in writing. If the notice is to Active8, it shall be sent to the attention of the Active8 Legal Department, Attention General Counsel.

14.3    Severability.  In the event of any invalidity of any provision of the Agreement, the parties agree that such invalidity shall not affect the validity of the remaining portions of the Agreement, and further agree to substitute for the invalid provision a mutually-agreeable valid provision which most closely approximates the intent of the invalid provision.

14.4    Headings.  The headings in the Agreement are for the convenience of reference only and have no legal effect.

14.5    No Third Party Beneficiaries.  The Agreement is intended for the sole and exclusive benefit of the signatories and is not intended to benefit any third party (including Users).  Only the parties to the Agreement may enforce it.

14.6    Assignment.  Licensee may assign, sublicense, delegate or transfer all of its rights and responsibilities under the Agreement by operation of law or otherwise to any subsidiaries or affiliates thereof with advance written approval from Active8, or to any other party in connection with a sale of this business.  Any assignment of the Agreement by Licensee in connection with a sale of its business shall relieve Licensee from any further liability hereunder.  Active8 may assign, sublicense, delegate or transfer all or any portion of its rights or responsibilities under the Agreement by operation of law or otherwise to any subsidiaries or affiliates thereof, or to any other party in connection with a sale of this business.  Any assignment of the Agreement by Active8 in connection with a sale of this business shall relieve Active8 from any further liability hereunder.  All

the terms and provisions of the Agreement shall be binding upon and inure to the benefit of the parties, their successors and permitted assigns.

14.7    Relationship.  Each party hereto is an independent contractor, and neither party is, nor will claim to be, a legal representative, partner, franchisee, agent or employee of the other.  The Agreement sets forth Active8's entire liability and Licensee's exclusive remedies relating to the Agreement and the Service provided to Licensee under the Agreement. Licensee's use of any third party's services or content accessed through the Service shall be governed by any agreement entered into between Licensee and such third party, and Active8 shall have no liability relating thereto.

14.8    Force Majeure.  Neither party shall be liable to the other for a failure or delay in its performance of any of its obligations under the Agreement (except for the payment of amounts due hereunder) to the extent that such failure or delay is caused by circumstances beyond its reasonable control or by events such as fire, riot, flood, labor disputes, natural disaster, regulatory action, internet or telecommunications failures, terrorist acts, or other causes beyond such party's reasonable control, provided that the non-performing party gives notice of such condition and continues or resumes its performance of such affected obligation to the maximum extentand as soon as reasonably possible, and provided further, that either party may terminate the Agreement upon delivery of written notice to the other party if such condition continues for a period in excess of sixty (60) days.

14.9    Export Restrictions. Licensee acknowledges and agrees that the Services are based on licensed software that is subject to restrictions and controls imposed by the Export Administration Act of 1979, as amended, and the Export Administration Regulations there under ("the Acts").  Licensee agrees and certifies that neither the licensed software nor any direct product thereof, including the Services, is being or will be used for any purpose prohibited by the Acts.  Licensee further agrees and certifies that neither the licensed software nor any direct product thereof, including the Services, will be exported to (i) the following countries which are currently subject to U.S. trade embargoes:  Cuba, Iran, Libya, North Korea, Sudan and Syria or (ii) persons or entities on the U.S. "Denied Persons List", "Specially Designated Nationals List" and "Entities List".  In addition, Licensee certifies that Licensee is not a citizen or permanent resident of any of the above listed countries and that Licensee is not on the U.S., "Denied Persons List", "Specially Designated Nationals List" or the "Entities List".

14.10    Counterparts and Fax Signatures.  This Contract associated with the Agreement may be executed in counterparts, each of which shall constitute an original, and all of which shall constitute one agreement.  A signature transmitted via facsimile or scanned original shall be deemed an enforceable signature for the purpose of demonstrating the signing party's assent to the Agreement. Each party represents that the person signing the Contract on its behalf has the requisite legal authority to bind the party on whose behalf he/she is signing.

14.11    Intentionally Left Blank.

14.12    Authority.  The individual executing the Contract on behalf of each Party represents and warrants that s/he is authorized to execute the Contract on behalf of such respective Party and bind the party on whose behalf s/he is signing.

14.13    Waiver.  A waiver of any breach or default under the Agreement shall not constitute a waiver of any other right for subsequent breach or default.


**Exhibit A**

**INTENTIONALLY LEFT BLANK**


**Exhibit B**

**Service Level Agreement (SLA)**

This Exhibit is incorporated into and made a part of the Agreement to which it is attached. Capitalized terms used and not defined herein shall have the meanings given such terms in the Agreement.

**1.    Definitions**

The following definitions apply to this SLA:

**1.1**  Emergency Maintenance means maintenance required as a result of conditions beyond Active8's reasonable control. Emergency maintenance may occur at any time, as Active8 deems necessary.

**1.2**  Outage means the period (measured in minutes) during which Availability is lower than the applicable service level as defined in Section 2 below, (excluding any Permitted Outage as defined herein). In the event of an Outage, the Active8 Customer Service team shall provide notice to Licensee in a timely manner and shall use commercially reasonable efforts to remedy such Outage.

**1.3**  Permitted Outage means any Outage which is caused by one or more of the following:

(a)  Activities which Licensee directs, denial of service attacks, natural disasters, changes resulting from government, political, or other regulatory actions or court orders, strikes or labor disputes, acts of civil disobedience, acts of war, acts against parties (including third party carriers or other vendors), or a force majeure event, as described in the Agreement;

(b)  Periods of Scheduled Maintenance or Emergency Maintenance activities which result in an Outage;

(c)  Licensee-provided content or programming errors including, but not limited to, content installation and integration;

(d)  System administration, commands, file transfers performed by Licensee's representatives;

(e)  Work performed at Licensee's request (for example, additional technical assistance);

(f)  Lack of availability or untimely response time from Licensee to respond to incidents that require its participation for source identification and/or resolution, including meeting "Company name" responsibilities for any prerequisite services;

(g)  Licensee's breach of its material obligations under the Agreement;

(h)  Licensee's performance of any, technical security integrity review, penetration test, or vulnerability scan;

(i)  An event to which Active8 reasonably believes to the best of its knowledge and experience that there is no alternative but to cause an Outage in order to resolve an issue, if time is of the essence and the appropriate Licensee individuals at are not contactable, Active8 may cause the Outage. Any such Outage shall be for as short a time as possible and shall be kept as localized as possible. Active8 shall inform Licensee as soon as is reasonably practicable of such Outage; and/or

(j)  a force majeure event.

**1.4**  "Scheduled Maintenance" means the period of time during which Active8 performs scheduled maintenance, making reasonably commercial efforts to schedule related outages for essential maintenance and updating which will occur on weekends and/or off-hours and shall not be planned to occur more than twelve (12) times during a calendar year. Active8 will make reasonable efforts to provide at least one (1) day's advance notice for standard maintenance, and thirty (30) minutes advance notice for Emergency Maintenance. Active8 reserves the right to extend or change the time periods of the Scheduled Maintenance.

## 2.  SERVICE LEVEL Availability

Active8 will use reasonable commercial efforts to ensure that the Service will meet or exceed the "Availability", defined as meaning that the network will be available ninety-nine point nine (99.9%) percent of the time, seven (7) days a week, twenty-four (24) hours per day, as calculated at the end of a rolling three (3)-month period. Availability shall exclude, and Active8 shall not be responsible for, any Outage which occurs as a result of a Permitted Outage.  Failure to meet SLA's will result in a 15% discount on the next quarter's bill.

## 3.  Data Backup

Active8 will use reasonable commercial efforts to ensure that the Service will back up database information to an offsite location every twenty-four (24) hours. Data will be stored on back-up servers for a maximum of thirty (30) days.

### 4.      Reports

If, at the end of each calendar quarter, the average Availability percentage for that preceding quarter is less than 99.9%, Active8 shall measure and report its performance of up-time, with and without Scheduled Maintenance, for such calendar quarter.

### 5.      NOTICES

Notifications required of Active8 hereunder will be made available to Licensee via a website designated and provided by Licensee.

### 6.      SLA Default

A "SLA Default" means three (3) Outages (excluding Permitted Outages) caused by separate, unrelated events during a consecutive two (2) month periods, or failure to meet the quarterly up-time requirements.

### 7.      Technical support

Send technical support requests to support@active8pos.com or call (469) 654-4357

Standard Support Hours:
Monday through Sunday: 7:00 AM – 7:00 PM EST (Excluding U.S. Federal Holidays)

Emergency Support Hours (must call)
Monday through Sunday: 7:00 PM – 7:00 AM EST
U.S. Federal Holidays: 7:00 AM – 7:00 PM EST

Requests will be responded to by the end of the next business day for all non-emergency support needs.

**Exhibit C**

**Service Description**

This Exhibit is incorporated into and made a part of the Agreement to which it is attached. Capitalized terms used and not defined herein shall have the meanings given such terms in the Agreement.

The description of software functionality is as follows:

### 1.      Active8 Point of Sale Functionality

**a.**   A web-based application designed to provide the following functionality: Point of Sale, Birthday Party Booking, Birthday Party Management, Online Ticket Purchase, Electronic Waivers, Customer Account Management, Employee Scheduling, and Employee Time Clock.

### 2.      Custom Services

**a.**   Active8 will add custom requirements/capabilities to any of the modules for Licensee for the Custom Work Fee, described in Exhibit A

**b.** These customizations will be scoped on an individual basis and done as a separate Scope of Work

    i.   Active8 retains right and title to any modifications or improvements made to the system. These modifications may be made available to other customers, as per Section 5 of the Agreement.

**c.** If multiple clients have similar requests for changes or improvements to any module, Active8, in its sole discretion, may decide to develop these and release the functionality as part of its ongoing development work associated with the modules listed above

**d.** Active8 may release other modules not listed herein, containing functionality not described above. These modules may be made available for purchase, at a price decided upon by Active8, in its sole discretion.

# EXHIBIT A-3

# ADDENDUM TO THE TERMS AND CONDITIONS

THIS Addendum to the Active8 Software Agreement and the Terms and Conditions (hereinafter "Addendum") made this 7th day of April, 2021 by and between **ACTIVE8 SOFTWARE LLC**, a Texas limited liability company, with its principal place of business located at 301 Leora Lane, Suite 250, Lewisville, Texas 75056 (hereinafter "Active8") and **ENTERTAINMENT AFFILIATES, L.L.C.**, a New Jersey limited liability company, its successors and/or assigns, having an office located at c/o Rock N Air, L.L.C., 420 Boulevard, Suite 201, Mountain Lakes, New Jersey 07046 (hereinafter "Licensee").

WHEREAS, Active8 and Licensee are the parties to that certain Active8 Software Agreement (hereinafter "Agreement") dated of even date as this Addendum; and

WHEREAS, the Agreement is subject to terms and conditions (hereinafter "Terms and Conditions"); and

WHEREAS, the parties have agreed to modify the Agreement and the Terms and Conditions which modification is to be set forth in this Addendum.

NOW THEREFORE, in consideration of the mutual promises, covenants and conditions hereinafter contained, the parties agree as follows:

1.      The recitals set forth above, and all defined terms set forth in such recitals and in the introductory paragraph preceding the recitals, are hereby incorporated into this Addendum as if set forth at length herein. Capitalized terms not otherwise defined herein shall have the same meanings as ascribed to them in the Agreement and the Terms and Conditions.

2.      The Agreement and the Terms and Conditions cannot be modified without the prior written consent of both Active8 and Licensee.

3.      The Non-Disclosure Agreement between the parties dated March 12, 2021 is hereby ratified and affirmed as if fully set forth in this Addendum.

4.      The Initial Term shall be five (5) years and any increases thereafter shall be reasonable.

5.      The monthly fees set forth in the Agreement shall commence upon Licensee completing transactions with the public using the point-of-sale system. The Agreement shall include all of the software available as part of the package selected by Licensee. This shall include any upgrades and additional modules offered as part of the same package to other clients. In the event Active8 offers any modules, as part of the same package, not listed in the Agreement and/or the Terms and Conditions it shall notify Licensee and such modules shall be made available to Licensee as part of the monthly fees, if that is what is offered to other clients. Licensee shall be permitted to switch the selected package.

6.      The second sentence of Section 6.2 of the Terms and Conditions shall only be applicable if (i) the SOW is approved and executed by Licensee and (ii) such SOW sets forth the cost to Licensee.

7.      Section 8.1 of the Terms and Conditions shall be substituted with the following: Active8 Indemnity.

Active8 Indemnity. Active8 agrees to indemnify, defend and hold harmless Licensee, its subsidiaries and Affiliates, and its and their directors, officers, agents, assigns and employees ("Indemnitees"), from any claim or demand, including reasonable attorneys' fees, made by any third party due to or arising out of or related to any action brought against Licensee by a third party to the extent that it is based upon a claim that the Service (excluding the Licensee Content), as made available by Active8 to Licensee under the Agreement and used within the scope of the Agreement, infringes any U.S. copyright, trademark or trade secret, and will pay any costs, damages and reasonable attorneys' fees attributable to such claim that are awarded either by final judgment or settlement against Licensee, provided that Licensee: (i) promptly notifies Active8 in writing of the claim; (ii) provides Active8, at Active8's request and expense, with all assistance, information and authority reasonably required for the defense and settlement of the claim. Active8 shall provide, in a diligent and expeditious manner, any material reasonable requested by Licensee pertaining to this matter. In the event Active8 is not diligently pursuing the claim and complying with the mandates of the court, Licensee shall, at its option, be permitted to require Active8 to cooperate and work together to defend the claim or demand. Licensee shall approve any settlement; provided, however, if Active8 has provides proof that the settlement proceeds have been placed in escrow with a licensed attorney such approval shall be deemed granted. Notwithstanding the foregoing, Active8 will have no liability for any infringement or misappropriation claim of any kind to the extent that it results from: (a) modifications to the Service caused by Licensee, if a claim would not have occurred but for such modifications; (b) the combination, operation or use of the Service with systems, equipment, devices, software or data caused by Licensee and not supplied by Active8 or specified in the Documentation, if a claim would not have occurred but for such combination, operation or use; (c) failure to use an updated or modified version of the Service if provided by Active8 to avoid a claim; (d) use of the Service by Licensee in violation of the Terms and Conditions or in a manner that violates applicable law or for a purpose that violates applicable law, (e) the Licensee Content (provided same was not authorized by Licensee and not caused by Active8), and/or (f) misuse of the Service by any of Licensee's Users (regardless of whether such Users are authorized or unauthorized by Licensee). Provided Active8 was not grossly negligence or engaged in willful misconduct or willful omission, the provisions of this Section 8.1 set forth Active8's sole and exclusive obligations, and Client's sole and exclusive remedies, with respect to infringement or misappropriation of intellectual property rights of any kind in connection with the Service. Indemnitees are not liable or responsible in any way for any errors, omissions or any other actions arising out of or related to the Service provided to Licensee in accordance with the Terms and Conditions. If Active8 is a registered entity and permits Active8's Affiliates, subsidiaries, employees, licensors, online service providers and/or any third party to access and/or use Licensee Content, Active8 shall be solely responsible for (i) their acts and/or omissions in connection with their access and/or use of the Licensee Content and (ii) ensuring that their access and/or use of the

Licensee agrees to indemnify, defend and hold harmless Active8 and its affiliates, and its affiliates, subsidiaries and persons who are in privity of estate with Licensee, or to whom Licensee is legally responsible, (collectively, "Representatives") for any liability, fines, penalties, costs, claims and/or damages incurred by Licensee and/or the Representatives in connection with any claim related to the Service provided to Licensee in accordance with the Terms and Conditions.

8.  Section 8.2 of the Terms and Conditions shall be substituted with the following: Licensee Indemnity.

Licensee Indemnity. Licensee agrees to indemnify, defend and hold harmless Active8, its subsidiaries and Affiliates, and its and their directors, officers, agents, assigns and employees ("Indemnitees"), from any claim or demand, including reasonable attorneys' fees, made by any third party due to or arising out of or related to any Licensee Content (excluding the use of the Licensee Content by Active8 not authorized by Licensee); Licensee's use (and its Users' use), misuse of or access to the Services in violation of the Terms and Conditions; Licensee's connection to the Service; Licensee's and/or its Users' violation of the Agreement or the applicable Terms of Service; or Licensee's violation of any proprietary or other rights of a third party or any User excluding any acts in connection with Active8's indemnity; or Licensee's or Users' violation of applicable law caused by Licensee or Licensee's Users', provided that Active8: (i) promptly notifies Licensee in writing of the claim; (ii) provides Licensee, at Licensee's request and expense, with all assistance, information and authority reasonably required for the defense and settlement of the claim. Indemnitees are not liable or responsible in any way for any errors, omissions or any other actions arising out of or related to the Service as opposed to the use of the Service or the Licensee Content caused by Active8 and not authorized by Licensee.  Active8 has the right to review and approve any settlement made by Licensee, that is not fully covered by Licensee's indemnity, which approval will not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Licensee will have sole control of the settlement if it is at no cost to Active8.  If Licensee is a registered entity and permits Licensee's Affiliates, subsidiaries, employees, and/or any third party to access and/or use the Service and/or Licensee Content, Licensee shall be solely responsible for (i) their acts and/or omissions in connection with their access and/or use of the Service in accordance with the Terms and Conditions and (ii) ensuring that their access and/or use of the Service is in compliance with the Agreement, and any and all applicable local laws, rules and regulations excluding any acts in connection with Active8's indemnity.  Notwithstanding the foregoing, Licensee will have no liability for any infringement or misappropriation claim of any kind to the extent that it results from: (a) the Service as opposed to Licensee's use of the Service; (b) violations that are the result of Active8 and not expressly directed to be performed by Licensee. Provided Licensee was not grossly negligent or engaged in willful misconduct or willful omission, the provisions of this Section 8.2 set forth Licensee's sole and exclusive obligations, and Active8's sole and exclusive remedies, with respect to and in connection with the Service.  Licensee agrees to fully indemnify Active8 and its affiliates, subsidiaries, licensors, and online service providers (collectively, "Representatives") for any liability, fines, penalties, costs, claims and/or damages incurred by Active8 and/or the Representatives in connection with any claim related to the access and/or use of the Service in accordance with this Section 8.2 and/or Licensee's Content by Licensee (excluding the use of the Licensee Content by Active8 or its Representatives not authorized by Licensee), Licensee's Affiliates, subsidiaries, employees or any third-party authorized by Licensee.

9.  Section 12.2.3 of the Terms and Conditions shall be substituted with the following: Termination for Convenience. Licensee may terminate the Agreement for any or no reason, provided Licensee is not delinquent on its payment, by sending ten (10) days prior written notice to Active8 and Licensee's fulfillment of its payment obligations through the end of the then-current Term shall be null and void.  Licensee's only payment obligations shall be through the end of the then-current month that the termination is effectuated by Licensee; provided, however, Licensee shall be additionally obligated for (i) the cost of any work completed on a SOW in accordance with the Agreement and (ii) an amount during the first year of the Initial Term equal to $2,900.00.  Licensee shall be permitted to terminate the Agreement during the first ninety (90) days of the Term without any costs or expenses, other than those already paid.  If Licensee exercises a Termination for Convenience, all fees due under this section must be paid in full at the time notice is provided.

10.  Licensee may assign, sublicense delegate and/or transfer any and all of its rights, title, interest, benefits and privileges under the Agreement to an "Affiliate" (as hereafter defined) without the consent of Active8 including, but not limited to, the software application offered as a service under the Agreement, provided Licensee remains liable for all of the terms and provisions set forth in the Agreement and the Terms and Conditions.  In the event Licensee performs any rights set forth in this paragraph the last sentence of Section 14.6 of the Terms and Conditions shall not be applicable.  An Affiliate shall be defined as (i) an entity under common ownership and/or control as Licensee, (ii) an entity that has an interest in Licensee or (iii) an entity in which Licensee has an interest.

11.  In order for the last sentence of Section 14.7 of the Terms and Conditions to be applicable, Active8 shall notify Licensee of such third party's services or content including providing a copy of such agreement.

12.  Licensee's fulfillment of its payment obligations shall be stayed if events beyond Licensee's reasonable control, that last longer than thirty (30) days, prevent it from conducting business under routine conditions including, but not limited to, fire, catastrophe, strikes or labor trouble, civil commotion, Acts of God, the public enemy, governmental prohibitions or regulations or inability to obtain materials by reason thereof, or any other causes beyond Licensee's reasonable control, and Licensee shall have no liability by reason of such delay.

13.  All of the rights of Active8 shall, to the extent practical, be mutual to Licensee and all of the obligations of Licensee shall, to the extent practical, be applicable to Active8.  Active8's obligations shall be performed using best efforts.  Active8 shall perform its obligations using reasonable care and diligence and in a professional and business-like manner.  Any and all of the obligations imposed upon Licensee shall be reasonable and pursuant to industry standards.

14.  Licensee shall have written notice and five (5) days to cure any defaults before Active8 can impose any penalties. If any default cannot reasonably be remedied within five (5) days after notice of default, then Licensee shall have such additional time as shall be reasonably necessary to remedy such default, provided within such five (5) day period Licensee shall have commenced performance of the acts required to cure said default hereunder and shall thereafter prosecute same to completion with diligence and continuity.

16.     Severability.  In the event of any invalidity of any provision of the Addendum, the parties agree that such invalidity shall not affect the validity of the remaining portions of the Addendum, and further agree to substitute for the invalid provision a mutually-agreeable valid provision which most closely approximates the intent of the invalid provision.

15.     Any consent from Licensee shall be in writing and signed by an authorized corporate officer.

16.     Except as specifically modified, supplemented or amended by this Addendum, all terms, conditions, obligations, covenants and agreements as set forth in the Agreement and the Terms and Conditions are hereby ratified and affirmed as if fully set forth in this Addendum.  Except as otherwise contained herein, all of the terms, conditions, obligations, covenants and agreements contained in the Agreement and the Terms and Conditions shall remain in full force and effect except as otherwise specifically set forth in this Addendum.  In the event of any conflict or inconsistency among the Agreement, the Terms and Conditions and this Addendum, the terms of this Addendum shall control.

**IN WITNESS WHEREOF**, the parties hereto have executed this Addendum on the date first above written.

ACTIVE8 SOFTWARE LLC,
a Texas Limited Liability Company

By:_____
    Gregory S. Spittle,
    CEO


ENTERTAINMENT AFFILIATES, L.L.C.
By:  ROCK N AIR, L.L.C.,
its Managing Member

*Robert M. Pagano*
By:_____
Robert M. Pagano (Apr 7, 2021 23:36 EDT)
    Robert M. Pagano,
    Managing Member

# Addendum to Terms and Conditions - Final

**Final Audit Report** 2021-04-08

| | |
|---|---|
| Created: | 2021-04-07 |
| By: | Gregory Spittle (greg@active8pos.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAE1JZBCv3V-vBBJLxbawh8ZIXNznOVVua |

## "Addendum to Terms and Conditions - Final" History

📄 Document created by Gregory Spittle (greg@active8pos.com)
2021-04-07 - 7:53:46 PM GMT- IP address: 47.190.51.20

✉ Document emailed to Robert M. Pagano (robert@rocknair.com) for signature
2021-04-07 - 7:55:21 PM GMT

📄 Email viewed by Robert M. Pagano (robert@rocknair.com)
2021-04-07 - 9:17:38 PM GMT- IP address: 96.56.195.58

🖊 Document e-signed by Robert M. Pagano (robert@rocknair.com)
Signature Date: 2021-04-08 - 3:36:02 AM GMT - Time Source: server- IP address: 96.56.195.58

✉ Document emailed to Gregory Spittle (greg@active8pos.com) for signature
2021-04-08 - 3:36:04 AM GMT

📄 Email viewed by Gregory Spittle (greg@active8pos.com)
2021-04-08 - 2:21:57 PM GMT- IP address: 71.84.152.167

🖊 Document e-signed by Gregory Spittle (greg@active8pos.com)
Signature Date: 2021-04-08 - 4:38:48 PM GMT - Time Source: server- IP address: 47.190.51.20

✅ Agreement completed.
2021-04-08 - 4:38:48 PM GMT


POWERED BY
Adobe Sign

# EXHIBIT A-4

**From:** Active8 Support <support@active8pos.com>
**Sent:** Monday, June 20, 2022 9:01 AM
**To:** Pat Drake <PDrake@rocknair.com>
**Subject:** [ANNOUNCEMENT] News from our CEO

Active8 + ROLLER = 



Today I am thrilled to announce that Active8 is joining forces with ROLLER! I am excited about what this means for you, and I wanted you to be the first to hear the news.

When I looked at how Active8 could best support you in the future, it was clear that we couldn't move as fast as we wanted to alone. ROLLER and Active8 are united by the same core mission of helping our customers bring joy and happiness to the world. The decision was easy when I met the highly-motivated and like-minded team at ROLLER and saw how we could help each other accelerate our customers' growth.

Whilst this is a change, I wanted to reiterate that our team, including myself, aren't going anywhere! We are in this for the long haul and committed to you, our loyal customers, and we can't wait to join the ROLLER team.

**Why is Active8 merging with ROLLER?**
ROLLER is a more mature product that will allow us to extend its benefits to our Active8 customers. This includes things like increased resources and a more sophisticated infrastructure. ROLLER also has a bigger, more global team which means we will be able to deliver more product value to you quicker. Meanwhile, Active8 has deep industry insight, especially in the US, which ROLLER is excited to leverage when building solutions.

**What do I need to do?**
There's nothing for you to do right now. This change will not have any immediate impact on how you use Active8, however over time the Active8 platform will eventually be retired. We will be working closely with the ROLLER team to develop an individualized migration plan best suited to your business based on the features you know and love in Active8.

We will be publicly announcing this news tomorrow, Tuesday June 21st, but I wanted you to hear the news directly from me. We're still working through a lot of the details, so this is just the first of many communications you'll receive as I will keep you in the loop every step of the way. If you do have any immediate questions, please reach out to our support team at 469-654-4357 or support@active8software.com.


Thank you,

**Greg Spittle**
**CEO of Active8 Software**



| KIOSK | CONTACT | BLOG | ACTIVE8 |
|-------|---------|------|---------|

888-500-2618
www.active8software.com

Unsubscribe

This message was sent to pdrake@rocknair.com from support@active8pos.com

Active8 Support
Active8POS
301 Leora Lane Suite 250
Lewisville, TX 75056, US

- - - - - - - - - - - - - - - - - - - - - - - - - - - -



# EXHIBIT A-5



**Alexia Nicoloulias**
anicoloulias@burkebog.com
1201 Elm Street, Suite 4000
Dallas, Texas 75270
D: (469) 780-0028

December 3, 2023

***Via U.S. Mail & E-mail:*** klonzo@lonzolaw.com
Kevin A. Lonzo, Esq.
Lonzo Law
136 4th Street N., Suite 243
Saint Petersburg, FL 33701

      Re:    Entertainment Affiliates, LLC//Active8 Software LLC

**NOTICE OF TERMINATION**

Mr. Lonzo:

As you are aware, this firm represents Active8 Software LLC ("**Active8**") in connection with the dispute between Active8 and Entertainment Affiliates, LLC ("**EA**").

**This letter serves as formal notice of termination of the Active8 Software Agreement** ("Software Agreement") signed and executed by Active8 and EA. Below provides an explanation for termination and expectation of the parties post termination.

About a year and a half ago, Active8 informed EA that the Service contracted for in the Software Agreement was transitioning from the Active8 platform to the Roller Software USA, Inc. ("**Roller**") platform, pursuant to a merger between the companies. Active8 provided adequate notice to EA for EA to associate itself with the new platform so that EA could continue receiving Service, just on a different platform. Accordingly, Active8 complied with Section 10 of Active8's Terms and Conditions ("**T&C**"). See a screenshot below for reference.

**10.    Service Modifications.**  Active8 reserves the right at any time and from time to time to modify the Service (or any part thereof) with or without notice and without altering the material functionality of the Service.  Such modifications would be made to correct errors, improve performance, etc.  In the event Active8 reasonably believes that any such modification could adversely affect all then-current licensees of the Service then Active8 will inform Licensee of such planned modification in advance and make such modification in a manner to minimize any such adverse effect.  Should Active8 choose to permanently discontinue the Service, Active8 (i) will exercise its right to terminate the Agreement for convenience pursuant to Section 12.2.3 below, and (ii) will post notification of such decision on the Service web site thirty (30) days prior to such discontinuance. Active8 will not be liable to Licensee or to any User or third party for any modification, suspension or discontinuance of the Service, or for any resulting loss or destruction of any Licensee Content that Licensee placed on the Service after the date of such notice. Active8 may specify in writing from time to time the version(s) of related products required in order to use the Service (e.g., supported browser versions etc.).

EA has been given ample time to make the transition along with opportunities to become acquainted with the new platform at the expense of Active8, and yet, EA has

failed to make the transition to date. Therefore, EA continues to disrupt Active8's business and cause Active8 to incur unnecessary expenses, including attorneys' fees.

On November 2, 2023, Active8, through counsel, provided written notice via e-mail of EA's breaches of the T&C, which included a subsequent demand for EA to cure said breaches within thirty (30) days of the notice. Specifically, EA failed, and continues to fail, to comply with Section 3.6 and 6.42.

With respect to EA's breach of Section 6.42., in the e-check authorization section of the Software Agreement, EA input "to be provided." This banking information was required at the outset. EA never provided this information and has been sending paper checks in violation of the T&C. Nonetheless, even if EA cures the payment method breach, the cure is immaterial absent EA's cure of Section 3.6.

As EA has failed to accept and comply with the transition of the Service onto the new platform within thirty (30) days of the notice of breach, Active8 officially **terminates** the Software Agreement in accordance with T&C Section 12.2.1. Accordingly, Active8 will cease EA's access to the Licensed Software and Service by **January 2, 2024**. Active8 will furnish EA, on or before January 2, 2024, with a Microsoft Excel spreadsheet (or other Microsoft Office product) containing that portion of EA's content that existed in the Service before December 2, 2023.

Upon receipt of this notice of termination, EA **must** comply with the terms of Section 12.4, which provides the responsibilities of the parties upon termination. Please review and advise EA to fulfill its responsibilities including:

(1) Return all Confidential Information, copies of any software, or third-party software, if any, and all other materials, whether tangible or intangible, furnished by Active8 pursuant to the Software Agreement;
(2) Pay Active8 any outstanding fees and expenses;
(3) Require all users of EA to cease use and access of the Service before January 2, 2024.

Active8 requests written confirmation to my firm of EA's compliance with Section 12.4 by January 3, 2024. Active8 appreciates EA's business and wishes EA the best in future endeavors. Should any questions arise, please contact me.

Regards,

Alexia P. Nicoloulias

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 82920277
Filing Code Description: Plaintiff's Original Petition
Filing Description: and Application for Temporary Restraining Order, and Temporary and Permanent Injunction and Motion for Expedited Discovery
Status as of 12/28/2023 1:18 PM CST

Associated Case Party: Entertainment Affiliates, L.L.C.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Alex M.Campbell | | acampbell@fbfk.law | 12/28/2023 12:42:32 PM | SENT |
| Luc J.Whyte | | lwhyte@fbfk.law | 12/28/2023 12:42:32 PM | SENT |
| Kirte Kinser | | kkinser@fbfk.law | 12/28/2023 12:42:32 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kashonna Ross | | kross@fbfk.law | 12/28/2023 12:42:32 PM | SENT |